ELIZABETH C. RHINE, ADMINISTRATRIX, APPELLEE, V. A. SCHALL COMPANY, APPELLANT.

FILED JUNE 23, 1914. No. 17,768.

1. Master and Servant: ACTION FOR DEATH: NEGLIGENCE OF MASTER: BURDEN OF PROOF. In an action against an employer to recover damages for the death of an employee alleged to have been caused by the negligence of such employer, the burden is on plaintiff to show some act of negligence as the proximate cause of decedent's death by a preponderance of the evidence.

2. ———: ———: ASSUMPTION OF RISKS. In such a case the decedent will be held to have assumed the ordinary risks incident to the business in which he was employed.

3. ———: ———: EVIDENCE: DIRECTING VERDICT. When in such a case the plaintiff fails to show, by some competent evidence, negligence on the part of the employer, it is the duty of the trial court to direct the jury to return a verdict for the defendant.

APPEAL from the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Reversed.*

*Smyth, Smith & Schall,* for appellant.

*Amos Thomas, Weaver & Giller* and *Crofoot & Scott,* contra.

BARNES, J.

This action was commenced in the district court for Douglas county by the widow of Joseph Rhine, deceased, as the administratrix of his estate, for damages resulting from his death while employed by the defendant. The amount sued for was $10,000. A trial resulted in a ver-

dict and judgment for $1,500, and the defendant has appealed. It appears that at the conclusion of plaintiff's evidence the defendant filed a motion requesting the district court to direct a verdict in its favor. The motion was overruled, and thereupon the defendant introduced its testimony, and the motion was renewed, and was again overruled.

It is contended by the defendant that the court erred in overruling its motions, for the reason that the evidence is insufficient to sustain a judgment in favor of the plaintiff. The record discloses that the defendant is in the business of cutting, dressing, handling and dealing in stone, having a yard and factory in the city of Omaha, where heavy blocks of stone are received, sawed and planed, and where defendant employs a large number of men. The stones when they come to the yards are handled and moved by means of a large traveling crane, so arranged as to carry them to any part of the ground, and to the saws where they are cut into the desired shapes and dimensions, and from the saws to any place where it may be necessary to store them.

There is no conflict in the evidence as to the manner in which plaintiff's decedent met his death. Certain slabs or blocks of stone 4½ to 5 inches in thickness, 4½ to 5 feet wide, and 9½ to 11 feet long, of corresponding weights, were removed from the saws and placed on edge against the timbers of one of the piers or frames supporting the tracks on which the carriers ran in removing the stone from place to place as necessity or convenience required. When so placed against the uprights referred to, they rested upon stringers or timbers laid upon the ground, which were solid, being covered with chips, sprawls, and refuse of stone, and the dust accumulated from stone sawings. Some three or four of the slabs had been laid down on the stringers, and preparations were being made to transfer them to the saws. One of the slabs was left standing on its edge leaning against the timbers. There was some little space or distance between those lying down and the ones standing against the timbers. The decedent,

Mr. Rhine, went in between them for the purpose of adjusting the apparatus by which they were to be lifted, and was working with his back toward the standing stone when it fell upon him and crushed him so badly that he almost instantly died.

The evidence is without conflict that the decedent had been employed by the defendant for a long time as a hookman; that, when the stones were brought to the yard on flat cars, decedent, with his assistants, took charge of the moving of the large blocks from the cars to the yard. He selected the place where they were to be deposited, and, by the use of a whistle as a signal, directed the engineer, who was situated in a room on the elevated tracks, where and how the stones should be placed. He also had charge of the signals by which directions were given to the engineer in handling all stones in the yard, both before and after they had been to the saws, and he and his assistants followed the general orders and directions of the superintendent, but in all matters of detail decedent exercised his own judgment.

It was alleged in the plaintiff's petition that all of the slabs or stones were of great weight, and that for their proper support it was necessary that they should be placed on firm, solid ground; and, further, that they should be placed on suitable heavy, sound timbers of sufficient size and length to create a solid and stable foundation; that the defendant company negligently and wrongfully failed to supply the place with suitable, solid, stable ground on which to lay said timber, but, on the contrary, negligently and wrongfully filled the place where said slabs were to be located with soft dirt and refuse, and thereby negligently and wrongfully directed and instructed the said decedent to locate and place said slabs thereon. It was also alleged that defendant negligently and wrongfully failed and neglected to furnish sound and suitable timbers of adequate size and length on which to pile said slabs of stone, but, on the contrary, said defendant negligently and wrongfully furnished a place as a support for slabs to be placed thereon of short pieces of wood that were

rotten and unsound and of inadequate dimensions as to
length, breadth, and thickness.

By its answer defendant admitted its corporate char-
acter, its line of business, that plaintiff was the widow of
Joseph Rhine, that prior to his death Rhine was in the
service of the defendant, and that he received the injuries
from which he died. All other allegations of the petition
were denied, and contributory negligence on the part of
the decedent was alleged, as well as assumption of the
risks incident to his employment. The reply was a gen-
eral denial.

On the trial one John L. Jackson was called as a wit-
ness for the plaintiff, and testified, in substance, that he
lived in Benson, Nebraska, had worked for the defendant
nine years all told; that he was working for the company
at the time of the death of Mr. Rhine; that it was his duty
to look after the machine and saw the stone in the saw-
mill; that he was working under Mr. Foll, who is one of
the firm, and who had charge of the yard as general man-
ager; that Foll gave orders as to what was to be done in
the yards when he was there, which was most of the time;
that there was a traveling derrick which traveled both
north and south and east and west, and covered a block
one way, east and west, and in the neighborhood of 50 feet
north and south; that there was a place provided for pil-
ing the stone, which included the uncut stone as well as
the cut stone; that there were timbers provided to place
the stone in order to keep them off the ground. Some of
the timbers were as large as 12x12, some were 12 to 14
feet long, some were outside the frame work, and some
were short ones. By outside the frame work was meant
that they had some timbers out in the yard that reached
from one pier to another. By one pier to another witness
said he meant the piers that carried this traveling der-
rick. The piers were on a rock foundation and were in
the neighborhood of 15 feet high. They were in the form
of a trestlework for the traveling crane to run on. The
stringers were placed on the ground for the stone to rest
on; they were placed east and west lengthwise to the yard

and rested on the earth. Witness said, in substance: I was handling the saws. They took the stones out with this crane and placed them on the stringers; that was the way they were required to be set up there, and was the customary way of setting them. The stones were all very nearly 5 inches thick, I would say from 4 to 4½ feet wide, and in the neighborhood of 10 or 11 feet long. I should judge that one of them would weigh about 3,000 pounds. These stones were taken out from my place and put on the stringers. Four of the stones were laid down flat to be put over on the diamond saw. They were so placed on Saturday, some time in the afternoon, and were left there flatwise. I think there were four. I don't know how many were left standing edgewise. There might have been a rough back on the stone setting against the post, but there was only one of that same size that was set up on the edge; that was the stone that fell on Mr. Rhine; that was the stone that stood edgewise against the post standing on the stringers. I did not see the stone until after it fell. I went out as soon as I learned of the accident. Mr. Rhine had been extricated, and had been taken out before I got there. Stone had been handled day after day during the time he was working there with the hooks; that is the way the work was done.

On cross-examination the witness further testified that he did not work with Mr. Rhine, but knew him eight or ten years before the accident; that Baldwin, the engineer, would sit up there in his cabin on the traveling crane; that there was a side-track adjacent to the yards at the east end of the traveling crane; that when a car-load of the stone came in on flat cars it would land at the east end of the traveling crane; that Mr. Rhine had charge of taking the stones off, and doing all that kind of work; that decedent had some other men that helped him; that whenever they started to take one of the big stones off the flat car they would place a grabhook under it, and a signal was given to the engineer with a whistle; it was Rhine who gave that signal. Sometimes his helpers would signal, but ordinarily Rhine was the man that signaled, and then the

engineer would move the traveling crane. The stone would be carried over to some other part of the yard, and when the signal was given the engineer would lower it and place it on the ground there; that for two or three years before Rhine's death he had had that job, but sometimes it was done by John Kolar, but the work was done by Mr. Rhine a greater part of the time; that the timbers on which the stones were placed were of different sizes and dimensions, and they had enough timbers there for a man to get and use them if he thought it was necessary. If Mr. Rhine thought, in his judgment, it was necessary to take timbers to brace them or level them up, there were timbers there he could get to do that; that in handling the stone Mr. Kolar and Mr. Rhine had their work to do, and they just went ahead and did it. "When there was a block of stone to be put up to the mill or to the saw, and I wanted to get rid of it and wanted to have the slabs taken away, I went to either of the fellows who were running the hooks. I would tell them that they were ready and to take them when they wanted to. I would not bother to go to the office and notify Mr. Foll. We never did that. If Rhine and Kolar were running the hooks I would notify them, and tell them it was ready whenever they wanted it. They would come on that information and get it away."

John Kolar testified, in substance, that he and Rhine were both doing the same kind of work; that Rhine had one hook and he had the other; that Rhine had charge of the hooks and the whistles; that the witness did not use any whistle. He said he was working with Mr. Rhine when he was killed—about 4½ feet from him on the east side of the slabs. "The slab that fell on him stood on the west side of him right back of him. When the whistle was blown to lift the load, the stone raised and it was coming over against me. That is all I know. The whole load was being raised at once, about three or four tons. * * * When the stone fell against Mr. Rhine, it shoved the load against me. I got out owing to the fact that there was a block between me and the pile of stone on the other side. * * * I did not see the stone fall; I only heard

a noise, looked up from attending to the hold- of my hook, and there he was caught by the hook, and I saw that slab and I started to holler, and then a couple of men came running over and lifted the slab off him. He was pinned in there between the slab that fell over and the four slabs that were in the load." When the slabs of stone came from the mill witness would help Mr. Rhine locate them in the yard; that "there was no particular place where we would pile them. We moved them around from one place to another. That was our work, mine and Joe's. By 'Joe' I mean Rhine. Rhine would find a place and locate them and take them off the car, and either stand them up or lay them down, put them wherever he thought best. When they came to pick out the particular place in the yard where we would pile the stones, we did not go and ask anybody with reference to that. Rhine would look in the yard and determine the place and put them there. We got Mr. Baldwin with his traveler, and picked them up (the stone in question) one at a time, and moved them about four to six feet west. The first one was a rough block. There was one leaning against the trestle work. When Rhine and myself went to work there on Saturday afternoon, we took one of the slabs and moved it about four or six feet west and leaned it up against the one that was already against the post. We took the next one and leaned it up against that. That was the last one we took over. When that was moved over Saturday afternoon we had trouble in making it stand. We took it up three or four times and let it stay leaning over, and it stood right there, and we went to work and laid the other four down and worked there all afternoon. The last one we set over we had some trouble in getting it to stand. It would not stand; it was kind of rough on the bottom, and we had to lean it. It was about eleven feet long, five feet high, and four inches thick." The witness and Rhine were the only ones working there, and Rhine had the whistle and gave the orders.

James R. Baldwin, the engineer in charge of the traveling crane testified: "No one, so far as I could see, touched

the stone at the particular time it toppled over. Mr. Kolar stood on one side and Mr. Rhine on the other. Rhine stood with his back toward the stone that toppled. There was nobody in the yard at that time of day only we three." Witness further testified that the stringers the stones were piled on were all good hard wood, all the way from three to six feet long and from three to six inches through; that there were a lot of them in the yard, and none of them were decayed that he had ever seen; that the ground down there, by reason of the chips of stone and the dirt that had been packed and tamped there in a good solid foundation and made very hard, had been in that condition for years. He further testified that "whenever one of those big stringers came in, 8x12 or 8 inches square, the hookers arranged for them as to where they would be placed. They would find a place to lower it down, and I let it down for them." He further testified that they did the work to suit themselves; that no one gave the orders, but they did it to suit themselves. The witness also testified that he had frequently heard Mr. Foll, the superintendent, talking to Mr. Rhine and the other hookman about being careful, and taking precautions to see that the stones that were placed on edge did not fall.

The witnesses for the defendant corroborated the testimony of the witnesses for the plaintiff, and it thus appeared that plaintiff's decedent understood his work perfectly, had been engaged in the same line of employment for a number of years, and had absolutely a free hand in moving and placing the large blocks of stone wherever he thought it best to place them in the yard. The evidence shows that Rhine himself placed the stone which fell on him, and no other person was at all negligent in handling it.

There is some evidence in the record tending to show that one of the stringers on which the stone was placed was somewhat rotten or decayed, but the stringers were selected by Rhine himself, and he alone was responsible for their selection. The testimony shows that there were sound

stringers in the yard which he could have selected, and if the stone fell because the stringer was unsound that was the fault of Rhine himself.

The plaintiff produced no competent evidence showing or tending to show that defendant had required Rhine to work in an unsafe place; but, of course, it is apparent from the evidence that great care was necessary in handling large heavy blocks of stone in the defendant's yards, and that Rhine knew that fact as well as any one, and assumed the necessary risk of performing his work.

It follows that the district court erred in refusing to direct the jury to return a verdict for the defendant both at the close of the plaintiff's testimony and after all of the evidence had been received. The judgment of the district court is therefore reversed and the cause remanded for further proceedings.

REVERSED.

FAWCETT, J., not sitting.

REESE, C. J., dissenting.

I find myself unable to agree to the majority opinion in this case, but have neither the time nor inclination to enter upon an elaborate discussion of the evidence, nor the merits of the case. As shown in the majority opinion, the superintendent of the work was one of the owners of the property. He was in the yards daily—practically all the time—superintending the work. It goes without saying that decedent was subject to his orders and directions in the management of the work in the yards. There is no evidence that Rhine assumed authority in the matter of the preparation of the safety appliances of, in, or about, the yards so long as they were under the inspection of the superintendent. True, decedent had worked for defendant for a long time, and in matters of detail under his immediate control often exercised his own judgment, but not when the superintendent was present and directing. In my opinion, the case turned upon the condition of the stringers or foundation upon which the heavy stone slabs rested. The evidence seems to me to be clear

and beyond question that there were two of those stringers upon which the slabs rested—one at either side. Under one side was a heavy piece of hardwood timber, which afforded a sure and safe foundation upon which the great weight of the stones rested. The one on the other side was made up of short pieces of timber of unequal lengths and sizes, and not of sufficient strength to bear the weight without springing and giving down, thus causing the standing slab to topple over and crush the life out of decedent. Added to this unquestioned proof, there was evidence that upon inspection made soon after the accident the pieces of timber composing the weaker side were decayed and rotten. Upon this subject the evidence was conflicting. Whose duty was it to pass upon the weight of the evidence upon this point? Clearly and unquestionably that of the jury. The evidence establishes the fact that the superintendent—one of the owners of the plant—had the fullest opportunity to know of these conditions. It was his duty to know. Is it at all surprising that, under the circumstances, Mr. Rhine should have relied upon him to furnish a place of safety? Who was negligent? The statute provides that all questions of negligence are for the jury. Under those circumstances, what right would the district court have had to step in, without allowing the jury to exercise their proper functions, take the case from them, and direct them how to decide? In my opinion, absolutely none. Then, what right has this court to exercise that power, usurp the functions of the jury, and pass upon the questions of fact? In my opinion, absolutely none. We have said so often, it is useless to repeat it, that all questions of fact are for the jury. The statute says that all questions of negligence are for them. Why not let these salutary rules stand?